Exhibit A

| | |
|---|---|
| DISTRICT COURT, DENVER COUNTY, COLORADO<br>Court Address:<br>Denver City & County Building<br>1437 Bannock Street<br>Denver, CO 80202 | DATE FILED: August 23, 2021 9:26 PM<br>FILING ID: E13B8BFB3978F<br>CASE NUMBER: 2021CV32652 |
| **JOSE LUIS CARRANZA TREJO,**<br><br>*Plaintiff*<br><br> v.<br><br>**XCLUSIVE STAFFING, INC.,**<br><br>*Defendant* | |
| ***Attorneys for Plaintiffs:***<br>PRESTON LAW, PLLC<br>Corey Preston (43536)<br>2814 William Neal Pkwy<br>Fort Collins, CO 80525<br>Phone: (720)425-8289<br>Email: corey@preston-lawyer.com | ☐   **COURT USE ONLY**   ☐<br><br>Case No.:<br><br>Division: |
| **COMPLAINT AND JURY DEMAND** ||

Plaintiff Jose Luis Carranza Trejo ("Mr. Trejo" or "Plaintiff"), individually and by and through the undersigned counsel, hereby complains against Defendant Xclusive Staffing, Inc. ("Xclusive" or "Defendant") as follows:

### INTRODUCTION

Plaintiff Mr. Trejo brings this Complaint in order to raise Title VII claims against Defendant Xclusive Staffing, Inc. Mr. Trejo began working for Xclusive in 2015, and before long found himself subjected to severe abuse and harassment by a direct supervisor who, on a near daily basis, derided Mr. Trejo's Salvadoran heritage, made ugly, derogatory statements about Salvadorans generally, and threatened Mr. Trejo with both physical violence and with termination. Multiple other employees in leadership positions with Defendant subjected Mr. Trejo to similar harassment, discrimination and threats, and many of Mr. Trejo's co-workers were encouraged by Mr. Ortiz to mock his heritage and subject him to harassment and abuse.

When Mr. Trejo complained about this discriminatory harassment, he was subjected to disturbing retaliation and threats from various employees of Defendant in various leadership positions, including threats of termination and threats against his family. The most

1

shocking example of these threats was a meeting at Defendant's corporate offices in which an individual, claiming to be a Department of Labor agent, brandished a gun and threatened Mr. Trejo with violence, deportation and termination if he did not cease making complaints.

The common thread through all of the harassment, retaliation and threats was Mr. Trejo's Salvadoran national origin. Anti-Salvadoran bias, and derogatory statements about Salvadorans, were a constant feature of the harassment and abuse Mr. Trejo suffered daily, and many of the threats of termination levied at Mr. Trejo referenced his status as a Salvadoran.

By January of 2017, as the hostile conduct directed at Mr. Trejo reached new lows, Mr. Trejo informed Defendant that he wished to report Defendant's misconduct and to seek help from the government in order to protect his rights. Shortly thereafter, Mr. Trejo was suspended from his position at the Colorado Convention Center, and then promptly terminated from that position.

Mr. Trejo followed through on his promise to seek government protection, and filed a charge with the EEOC, which found reasonable cause with regards to many of his allegations. He now brings claims for redress under Title VII – below are the details of those claims.

## PARTIES

1.      Plaintiff Jose Luis Carranza Trejo is a resident of the state of Colorado, with a domicile located in Aurora, Colorado.

2.      Defendant Xclusive Staffing, Inc. ("Defendant" or "Xclusive") is a corporation organized in the state of Colorado, with a principal place of business at 8774 Yates Dr., Suite 210, Westminster, CO 80031, and a business office located at 74 South Federal Blvd, Denver, CO 80219.

3.      As detailed below, Mr. Trejo worked primarily at the Colorado Convention Center in Denver, Colorado until his termination from that position, and the majority of the harassment and derogatory conduct directed at Mr. Trejo occurred at the Colorado Convention Center.

## JURISDICTION AND VENUE

4.      Jurisdiction of this Court is proper pursuant to the Colorado Constitution Article VI, § 9, and the amount in controversy meets the jurisdictional limit of this Court.

5.      Plaintiff's claims arise out of Title VII, 42 U.S.C. § 2000e-2 and 42 U.S.C. § 2000e-3, and is brought under the authority of 42 U.S.C. § 2000e-5(f)(1) and (3).

6.      Venue is proper under C.R.C.P. 98(c) because the events giving rise to the claims asserted herein took place primarily in Denver County.

## ADMINISTRATIVE BACKGROUND

7.      Mr. Trejo timely filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC-Charge No. 541-2017-00850) on February 28, 2017 for discrimination on the basis of religion (Mr. Trejo is Protestant), national origin (Mr. Trejo is Hispanic, and from El Salvador) and retaliation.

8.      On October 29, 2020, the EEOC found reasonable cause with regards to multiple elements of Mr. Trejo's charge, specifically that Defendant subjected Plaintiff to harassment based on his national origin, and that Defendant subjected Mr. Trejo to further harassment, a suspension and discharge in retaliation for Mr. Trejo's protected activity.

9.      On May 25, 2021, the EEOC issued and mailed a Notice of Right to Sue, and Mr. Trejo received the Notice of Right to Sue via U.S. Mail within a few days after that date.[1] Mr. Trejo has timely filed this Complaint within 90 days following receipt of the Notice of Right to Sue.

10.     Having received a Notice of Right to Sue, Mr. Trejo has administratively exhausted his claims pursuant to 42 U.S.C. § 2000e-5.

11.     At all relevant times, Defendant has done continuous business in the State of Colorado and has continuously employed at least 15 employees.

12.     At all relevant times, Defendant has been an employer engaged in an industry affecting commerce within the meaning of Sections 701(b), (g) and (h) of Title VII, 42 U.S.C. §§ 2000e(b), (g) and (h).

## FACTUAL BACKGROUND

13.     Mr. Trejo is a Salvadoran immigrant, a devoted husband and father of four, who resides in Aurora, Colorado.

14.     Defendant is an employment/staffing agency which emphasizes proving staffing for housekeeping needs.

15.     Mr. Trejo was initially hired by Defendant in or around June of 2015 to work as a food preparer at the Colorado Convention Center.

16.     Shortly thereafter, in or around October of 2015, Mr. Trejo was reassigned by Defendant to work as a housekeeper/cleaner at the Colorado Convention Center. This was a desirable change for Mr. Trejo, as it involved better pay and more hours.

---

[1] Mr. Trejo is uncertain of the exact date he received the Notice of Right to Sue in the mail, but pursuant to F.R.C.P. 6(d), receipt is generally presumed to have occurred at least 3 days following the date the Notice is sent. Regardless, this Complaint is filed within 90 days following the date of the EEOC mailed the Notice, and therefore less than 90 days following the actual receipt by Plaintiff.

17.     During the time periods described herein, Mr. Trejo occasionally took on additional work at other locations, but his primary assignment was at the Colorado Convention Center.

18.     From October of 2015, until his termination in February of 2017, Mr. Trejo consistently worked long hours, from a full-time 40 hours, to as many as 65-70 hours per week for Defendant, with the overwhelming majority of that work at the Colorado Convention Center.

19.     Throughout his time working at the Convention Center, Mr. Trejo was often praised for his exceptional work ethic, his willingness to work additional hours and cover shifts, and his ability to finish his work promptly and well.

20.     For Mr. Trejo, this was a job which allowed for consistent work and income, one which he performed very well, and one that allowed him to provide for his family.

**I.      Harassment Based on National Origin by Direct Supervisor**

21.     In or around the summer of 2016, Defendant assigned Mr. Pedro Ortiz to oversee and supervise Mr. Trejo in his work at the Colorado Convention Center.

22.     Mr. Ortiz had myriad familial connections with other supervisory and executive leadership with Xclusive, including Mr. Ortiz's wife, who served as supervisor prior to Mr. Ortiz, and his sister, Claudia Gutierrez, who was at all times relevant to this Complaint a Vice President with Defendant.

23.     Soon after Mr. Ortiz began working as supervisor at the Colorado Convention Center, he began harassing Mr. Trejo, singling him out for persistent, near-daily harsh treatment and ridicule on the basis of Mr. Trejo's national origin (El Salvador/Salvadoran).

24.     Mr. Ortiz, who is Mexican, subjected Mr. Trejo to a constant deluge of derogatory statements, including but not limited to the following examples: (i) repeatedly referring to Mr. Trejo as "perro" (Spanish for "dog"); (ii) deriding Mr. Trejo with statements that Salvadorans are "trash" and Salvadoran women are "prostitutes"; (iii) stating openly that Mr. Ortiz does not like Salvadorans, that he wished to get all of the Salvadorans fired, and replace them with Mexican employees.

25.     Mr. Ortiz made statements of this nature to Mr. Trejo virtually every time he and Mr. Trejo worked in close proximity, on an almost daily basis.

26.     Mr. Ortiz also routinely and persistently threatened Mr. Trejo's job, telling Plaintiff that Mr. Ortiz intended to get Mr. Trejo fired, and that Mr. Trejo would not be able to find work elsewhere and would not be able to care for his family. Mr. Ortiz often linked these threats directly to the fact that Mr. Trejo was Salvadoran, openly admitting that he did not like Salvadorans, and deriding Salvadorans as poor workers.

27.     As Mr. Trejo's supervisor, Mr. Ortiz had control over Mr. Trejo's work activities, and he routinely manipulated Mr. Trejo's schedule in a way designed to create

inconvenience Mr. Trejo, or to demean and diminish him. For example, on more than one occasion, Mr. Ortiz told Mr. Trejo that he would only be assigned to clean bathrooms because that was all Mr. Trejo "deserved" as a Salvadoran.

28.     On another occasion, Mr. Ortiz lied to Plaintiff that he was not scheduled to work, when in fact he was scheduled. This was, upon information and belief and based on Mr. Ortiz's repeated statements to this effect, an effort by Mr. Ortiz to undermine Plaintiff and get him reprimanded or fired.

29.     Mr. Ortiz and other employees, on multiple occasions, falsely accused Plaintiff of offenses including being inebriated on the job and of stealing, and told Plaintiff that he would be fired based on these false accusations.

30.     Mr. Ortiz also encouraged other staff members – including other supervisors and co-workers of Mr. Trejo – to verbally abuse and mock Plaintiff. Such abuse was often based around Mr. Trejo's national origin: these individuals would mock Plaintiff's imperfect English, and make vulgar or derogatory statements about Plaintiff, his language and culture.

31.     Mr. Ortiz and other employees, with Mr. Ortiz's encouragement, prevented Plaintiff from eating lunch with his co-workers in the lunchroom, mocking him, blocking him from sitting in chairs, telling him he could not eat with them, and forcing him to eat his lunch in separate areas of the building. Eventually, Plaintiff simply stopped bringing his lunch in order to avoid abuse and humiliation.

32.     In addition to the deluge of harassment and demeaning statements, Mr. Ortiz also threatened Mr. Trejo physically on multiple occasions, including one instance in which he menaced Mr. Trejo with a knife.

33.     Mr. Ortiz's harassing and discriminatory conduct towards Plaintiff – which he encouraged among other members of the staff – continued throughout Plaintiff's employment with Defendant, on a constant, near-daily basis, and it would, as discussed below, reach new, intolerable lows in early 2017.

## II.     Other Harassment and Discriminatory Acts

34.     Mr. Ortiz was responsible for the majority of the daily harassment Plaintiff was subjected to, but multiple other employees of Xclusive, including members of Xclusive's leadership, contributed to the hostile, intolerable atmosphere.

35.     For example, on many occasions, Claudia Gutierrez, Mr. Ortiz's sister and a Vice President with Xclusive, demeaned Mr. Trejo's Salvadoran heritage, referred to him as a "dog," threatened to fire him, and told him that if she did fire him, he would be rendered lower than a "dog in the streets."

36.     Multiple other close familial relations of Mr. Ortiz worked for, and held positions of relative authority with, Defendant, including Mr. Ortiz's wife and his sister-in-law. These individuals also threatened termination, derided both Mr. Trejo's Salvadoran

heritage and individuals from El Salvador generally, and on one occasion, Mr. Ortiz's wife attempted to physically harm Mr. Trejo by throwing a radio at him.

37.     As noted above, multiple of Mr. Trejo's coworkers at the Colorado Convention Center participated in harassment, derogatory comments, and refusing to allow Mr. Trejo to eat lunch in the lunchroom with his colleagues. These coworkers engaged in this behavior at the encouragement of their supervisor, Mr. Ortiz.

38.     Many times during his employment with Defendant, Mr. Trejo was ordered to speak only English, despite the fact that he was not fluent in the language, and he was often mocked for his imperfect English.

39.     On one occasion, a supervisor made general statements about how Salvadorans caused "problems" in the work place. This same supervisor often derided Mr. Trejo for complaining about mistreatment directed at himself and other employees from El Salvador.

40.     In or around the summer of 2016, Plaintiff also faced harassment as a result of his religion (Protestant), when a co-worker named Jose Hernandez, who happened to be a cousin of Defendant's President, approached Plaintiff and asked if he believed in God.

41.     Mr. Hernandez stated that if Plaintiff renounced his belief in God, then Mr. Hernandez would ensure Plaintiff received benefits including better shift assignments. The implication, due to Mr. Hernandez's status as a close relation of Defendant's President, was that a failure to renounce his religion would result in adverse employment consequences.

42.     Mr. Hernandez also was involved, along with Mr. Ortiz and other relatives of Mr. Ortiz, in an effort to get Plaintiff fired by going to the restrooms Mr. Trejo had already cleaned, and messing them up. The goal, upon information and belief and based on the express statements by Mr. Ortiz, was to get Mr. Trejo reprimanded and fired, as well as to force him to go back and do the work again.

43.     The above-described harassment contributed to a broader culture that was extraordinarily hostile towards Mr. Trejo. His direct supervisor, Mr. Ortiz, was the primary driver of the daily hostile work environment, but many other supervisors and employees – including multiple relatives of Mr. Ortiz – participated in the harassment.

44.     When Plaintiff attempted to complain about this discriminatory harassment, Defendant made it very clear to Mr. Trejo that such serious misconduct would be tolerated, even encouraged, by Defendant.

**III.     Complaints to HR and other management**

45.     Throughout his employment with Defendant, Plaintiff made many reports and complaints to HR, to his direct supervisors, and to other management personnel with Defendant, about Mr. Ortiz's outrageous harassing behavior and the discriminatory conduct, harassment by other employees, as well as various other serious issues in the workplace and

demands upon him that he was uncomfortable with, but those complaints were ignored, or in some cases, met with threats and retaliation as detailed below.

46.     For example, shortly after the harassment from Mr. Ortiz began, in or around the summer of 2016, Plaintiff met with an HR representative for Defendant.

47.     Plaintiff described Mr. Ortiz's harassing and discriminatory conduct, but the HR representative responded by dismissing Plaintiff's allegations, and calling Plaintiff a liar.

48.     At that same meeting, the HR representative refused to speak Spanish with Plaintiff, and told Plaintiff that if he wished to speak with her, he must speak English. Plaintiff spoke only limited English, and his complaints were dismissed by Defendant without any meaningful consideration or action.

49.     In total, Plaintiff estimates that he made more than a dozen complaints, formally and informally, to HR; to various members of Defendant's leadership, including the company's President and one attempt to speak directly to the company's owner, who refused to speak with Plaintiff; to supervisors and co-workers; and to personnel from the Colorado Convention Center. Defendant took no meaningful remedial action, and Plaintiff's complaints about ongoing, constant harassment were repeatedly dismissed as lies or gossip.

### IV.     Threats and Retaliation in Response to Plaintiff's Complaints

50.     After Plaintiff attempted to raise his concerns with other of Defendant's management personnel, Plaintiff was summoned, in or around the autumn of 2016, to a meeting at Defendant's offices where he was subjected to a shocking series of threats aimed at bullying him into stopping his complaints.

51.     At this meeting, Plaintiff was asked to sit down with a man purporting to be named "Chris," who told Plaintiff he worked as a federal agent for the Department of Labor.

52.     Mr. Trejo was hopeful that this alleged DOL agent would be able to assist him with the ongoing harassment and threats, and asked the individual for help.

53.     The individual then shocked Mr. Trejo by exposing a purported government credential and a firearm, then pointing the gun at Mr. Trejo and threatening his life.

54.     The individual claiming to be a DOL agent stated, among other things, that he had the ability to "deport" Mr. Trejo, that he had "experience with Salvadorans," and that no further complaints about Defendant's workplace would be tolerated.

55.     When Plaintiff indicated that he wished to speak to Defendant's President, Mr. Eloy Yanez, the individual claiming to be a DOL agent stated that any efforts to contact the owner of Defendant with complaints would be considered a federal crime.

56.     An executive secretary for Defendant who reported directly to Defendant's highest levels of leadership, was present for a portion of this meeting, and afterwards, she apologized to Mr. Trejo, saying that she did not know the meeting would get out of control.

57.     Following the meeting with the purported DOL agent, Mr. Trejo was terrified, fearful that he would lose his job, or that he could be deported. He even feared, based on the purported DOL agent's threats, that the individual would attempt to harm him or his family.

58.     He felt he had no choice but to return to work, but feared raising complaints due to the threats made against him, and suffered from significant anxiety, mental anguish and depression.

59.     The shocking meeting with the purported DOL agent wasn't the only time Mr. Trejo was subjected to threats by Defendant.

60.     On many occasions, Ms. Gutierrez threatened Mr. Trejo with termination if he did not cease complaining about the harassment and discriminatory conduct by Mr. Ortiz (her brother).

61.     Ms. Gutierrez even went so far, on at least one occasion, as going to Mr. Trejo's residence to verbally abuse him in response to his complaints.

62.     Defendant's President Mr. Yanez, meanwhile, told Mr. Trejo that he should be careful about raising complaints about the workplace, stating cryptically, without explanation, that Plaintiff and his family would "pay the price" if he continued complaining.

63.     Defendant's repeated refusal to take Mr. Trejo's complaints seriously, its stunning threats and retaliation in reaction to those complaints, only served to further create a culture where bad acts by privileged leadership (in some cases family members of higher-level leadership) were condoned and encouraged, and where good faith complaints about discrimination were aggressively stifled and discouraged.

64.     In this environment, Mr. Trejo had no reasonable basis to believe that Defendant would protect him against escalating harassment and discrimination.

65.     The result was that Mr. Trejo increasingly dreaded going to work, fearful of the humiliation and threats, and suffered from severe mental anguish, anxiety, humiliation and depression.

**V.     Escalation of Harassment and Discrimination**

66.     Following the threats by Defendant in or around autumn of 2016, the harassment and discrimination at the hands of Mr. Ortiz only increased.

67.     During this time period, between autumn of 2016 and Defendant's termination of Plaintiff's position in early 2017, Mr. Ortiz became more outwardly hostile towards Plaintiff, he continued to make hateful statements about Salvadorans, and he openly bragged to Plaintiff that he had been sent by Defendant's President, Mr. Yanez, to make Plaintiff's life miserable, and force him out of his job.

8

68.     During this time period in late-2016 and early-2017, much of the hostile conduct described above – messing up areas Plaintiff had already cleaned, humiliating him by not allowing him to eat his lunch with other employees, making false accusations and stating that the intent was to get him fired – became increasingly aggressive and intimidating.

69.     During this time period in late-2016 and early-2017, the above-described threats of termination from Mr. Ortiz and other members of Defendant's management and leadership became a constant, many-times-per-day occurrence.

70.     Also during this time period, Plaintiff's wife, who also worked for Defendant, was the alleged victim of ongoing serious harassment and sexual misconduct at the hands of Mr. Ortiz, as detailed in a complaint filed in Denver County District Court as Case No. 2018 CV 32442. The Complaint alleges, among other things, that Mr. Ortiz threatened Plaintiff's wife that he would have his sister, Claudia Gutierrez, terminate her husband (Plaintiff), and that Mr. Ortiz would manipulate Plaintiff's work responsibilities so that he could be alone with Plaintiff's wife. Complaint, Case No. 2018 CV 32442, at paras. 49, 52.

71.     During this time period, Plaintiff was, in fact, frequently ordered by Mr. Ortiz to work on different floors from Plaintiff's wife.

72.     Throughout this time period, from late-2016 until early-2017, Plaintiff's mental anguish, anxiety and depression worsened. He sought counseling, but remained fearful for his family's safety, he was terrified of losing his job, his time at work became a fog of uncertainty, fear, embarrassment and humiliation, and he began to lose weight.

73.     In late-January of 2017, Defendant summoned Plaintiff to a meeting and told him that the management of the Colorado Convention Center had complained about his attitude with regards to Mr. Ortiz.

74.     This was surprising to Plaintiff, because Mr. Ortiz's harassment and derogatory and threatening statements were worse than ever, and Plaintiff was simply trying to keep his head down.

75.     At this meeting, Plaintiff reiterated that the problem was constant, ongoing abuse by Mr. Ortiz of Plaintiff. In response, he was told by the HR representative that there were no complaints or issues with Mr. Ortiz, that the Convention Center was in fact praising Mr. Ortiz and singling out Plaintiff as problematic. The HR representative again accused Plaintiff of lying about Mr. Ortiz's conduct.

76.     Plaintiff advised Defendant that he could not take this abuse and inaction any longer, that he intended to report Defendant's misconduct, and that he intended to seek help from the government in order to protect his rights.

77.     Plaintiff briefly returned to work following this meeting, but the harassment, derogatory and demeaning conduct, and threats continued.

78.     Within roughly two weeks after Plaintiff's statement about seeking assistance from the government with regards to his rights, he was suspended by Defendant from the workforce at the Convention Center.

79.     Within days following his suspension, Defendant terminated Plaintiff's position at the Convention Center.

80.     Upon information and belief, and based upon representations by Defendant to the EEOC, Plaintiff ostensibly remained eligible for reassignment by Defendant for a period of time following his termination from the position at the Colorado Convention Center. However, Defendant did not directly offer any new assignments to Plaintiff, and based upon all of his conversations with Defendant – during which he was expressly told by management that he was terminated – Plaintiff viewed himself as having been terminated upon the termination of his position at the Colorado Convention Center.

81.     Upon information and belief, and based upon the countless statements from Mr. Ortiz and other members of management (i) degrading Salvadorans and indicating a desire to terminate Salvadorans, (ii) threatening termination of Plaintiff based on his Salvadoran national origin, and (iii) threatening termination in retaliation for Plaintiff complaining, Defendant's decision to terminate Plaintiff was because of his national origin and/or in retaliation for his complaints.

82.     With regards to all of the unlawful employment conduct described above, management of Defendant had knowledge of the pervasive and severe discriminatory harassment and abuse, the threats and retaliation, and the discriminatory and/or retaliatory motivations surrounding Plaintiff's suspension and termination, because (i) Plaintiff complained to management many times, (ii) the harassment and abuse was open, flagrant and constant, and it would be impossible for any reasonable manager to not know, and (iii) many members of Defendant's management engaged in, encouraged, condoned, and/or observed the harassment and abuse.

83.     Based upon Defendant's knowledge of the unlawful employment conduct, its refusal to correct such unlawful conduct, and its management's open engagement in such conduct, in an increasingly hostile and discriminatory manner, Defendant's misconduct was knowing and intentional, and with malice and/or reckless indifference to Plaintiff's protected civil rights.

84.     Following his termination from the Colorado Convention Center, Plaintiff continued to suffer from substantial mental anguish, anxiety and depression as a result of the extreme hostility, harassment, and discriminatory/retaliatory treatment Defendant subjected him to, and his immense embarrassment and humiliation at the discriminatory events that had led to his termination.

## PLAINTIFF'S FIRST CLAIM FOR RELIEF
### (Discrimination under Title VII—Harassment and Hostile Work Environment)

85.     Plaintiff incorporates all preceding and subsequent paragraphs as if fully set forth herein.

86.     Plaintiff is a member of the protected class of individuals whose national origin is El Salvador (Salvadoran).

87.     As described in more detail above, while employed by Defendant, Plaintiff was subjected to near-constant, unwelcome harassment and abuse at the hands of his direct supervisor, as well as other upper-level employees and executives of Defendant. This harassment included: hateful and derogatory statements about Salvadorans generally; statements demeaning Plaintiff because of his Salvadoran heritage; efforts to interfere with and undermine Plaintiff's work; efforts to assign Plaintiff, because of his Salvadoran heritage, to what was perceived as demeaning work; demeaning and humiliating Plaintiff in the workplace, including by refusing to allow him to eat lunch with other employees; threats that Plaintiff would be terminated and/or that all Salvadorans should be terminated; threats against Plaintiff and his family, including threats of deportation and physical threats.

88.     Such constant harassment of Plaintiff by Defendant, as well as the threats directed at Plaintiff, were because of Plaintiff's membership in a protected class, specifically his national origin as a Salvadoran.

89.     The constant harassment and abuse by Defendant was so pervasive and severe that it altered myriad terms, conditions, and privileges of Plaintiff's employment, and created an abusive working environment.

90.     The constant harassment and abuse by Defendant was so severe and pervasive that a reasonable person in Plaintiff's position would find the work environment to be hostile or abusive, and would find such work environment to unreasonably interfere with an objective employee's work performance.

91.     From Plaintiff's perspective, the constant harassment and abuse by Defendant was subjectively hostile and abusive: he dreaded going to work, he faced constant ridicule and aggression at work and was humiliated and demeaned on an almost daily basis, he suffered from severe mental anguish, anxiety, depression and fear, all as a result of the hostile work environment.

92.     Ultimately the harassment and misconduct by Defendant culminated in multiple adverse tangible employment actions, including Defendant's suspension of Plaintiff from his job at the Colorado Convention Center, and its termination of Plaintiff from his job at the Colorado Convention Center.

93.     Management of Defendant was aware of such harassment and abuse because Plaintiff complained to management many times; such abuse was so pervasive that any reasonable employer would have had to have been aware of it; many members of Defendant's management engaged in, encouraged, condoned and/or observed the harassment and abuse.

94.     Defendant's unlawful employment practices described above were knowing and intentional, and with malice and/or reckless indifference to Plaintiff's protected civil rights.

95.     Because of Defendant's actions, Plaintiff suffered damages and losses, in amount to be proven at trial, including lost wages, loss of earnings potential, pain and suffering, emotional distress, embarrassment and humiliation, emotional distress, and impairment of quality of life.

### PLAINTIFF'S SECOND CLAIM FOR RELIEF
### (Discrimination under Title VII—Termination Motivated by National Origin)

96.     Plaintiff incorporates all preceding and subsequent paragraphs as if fully set forth herein.

97.     Plaintiff is a member of the protected class of individuals whose national origin is El Salvador (Salvadoran).

98.     Throughout Plaintiff's employment with Defendant, management and supervisors threatened to terminate Plaintiff's position at the Colorado Convention Center, and to terminate other Salvadorans, because of derogatory biases which such individuals admitted to holding against Salvadorans.

99.     Defendant terminated Plaintiff's position at the Colorado Convention Center, and Plaintiff's status as a Salvadoran was a motivating factor in such termination.

100.    Defendant's unlawful employment practices described above were knowing and intentional, and with malice and/or reckless indifference to Plaintiff's protected civil rights.

101.    Because of Defendant's actions, Plaintiff suffered damages and losses, in amount to be proven at trial, including lost wages, loss of earnings potential, pain and suffering, emotional distress, embarrassment and humiliation, emotional distress, and impairment of quality of life.

### PLAINTIFF'S THIRD CLAIM FOR RELIEF
### (Unlawful Retaliation under Title VII)

102.    Plaintiff incorporates all preceding and subsequent paragraphs as if fully set forth herein.

103.    Plaintiff engaged in activity protected by Title VII including but not limited to: raising multiple complaints about the severe and pervasive harassment he was subjected to on the basis of his national origin; advising Defendant, when Defendant repeatedly refused to address these issues, that he intended to seek help from the government in order to protect his rights.

104.    Defendant knew of the fact that Plaintiff engaged in activity protected by Title VII.

105.    In response to Plaintiff's engaging in protected activity, Defendant retaliated against Plaintiff by, as described above, subjecting Plaintiff to severe and abusive threats, perpetuating and escalating the harassment and abusive behavior, interfering adversely with Plaintiff's work assignments and work conditions, and ultimately terminating Plaintiff's position at the Colorado Convention Center.

106.    Plaintiff's complaints and protected activities under Title VII were directly causally linked to Defendant's materially adverse actions against Plaintiff. On multiple occasions Defendant directly cited Plaintiff's complaints while subjecting him to abuse, Defendant threatened to terminate Plaintiff's position if he continued to complain, and Defendant did, in fact, terminate Plaintiff's position within roughly two weeks after he stated that he intended to government protection of his rights.

107.    A reasonable person would find the above-described conduct by Defendant to be materially adverse employment actions, and such conduct would have the effect of dissuading a reasonable person from engaging in protected activities or otherwise seeking protections afforded by law.

108.    The effect of such materially adverse employment actions by Defendant was to deprive Plaintiff of equal employment opportunities, and to adversely affect his employment status.

109.    Defendant's unlawful employment practices were knowing and intentional, and with malice and/or reckless indifference to Plaintiff's protected civil rights.

110.    Because of Defendant's actions, Plaintiff suffered damages and losses, in amount to be proven at trial, including lost wages, loss of earnings potential, pain and suffering, emotional distress, embarrassment and humiliation, emotional distress, and impairment of quality of life.

WHEREFORE, the Plaintiff requests that judgment be entered in his favor and against the Defendant in an amount to be determined at trial, and that this court award Defendant all relief allowed by law and equity, including but not limited to:

(i)      economic damages, in an amount to be determined at trial, arising from lost wages, lost benefits, lost compensation, lost employment opportunities, other compensatory/consequential damages associated with any costs, expenses or other damage arising from the acts alleged herein, and other equitable and make-whole relief associated with Plaintiff's economic losses;

(ii)     compensatory damages, in an amount to be proven at trial, arising from emotional pain and suffering, inconvenience, mental anguish and other nonpecuniary losses;

(iii)    punitive and/or liquidated damages as allowed by relevant federal and/or state law;

(iv)     attorney fees as allowed by federal and/or state law;

(v)      the costs of bringing this action;

(vi)     pre- and post-judgment interest from the date of the incident as provided by law; and

(vii)    such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a jury trial on all issues for which he is entitled to one.

RESPECTFULLY SUBMITTED this 23rd day of August, 2021.

PRESTON LAW, PLLC

/s/ Corey Preston

_____

Corey Preston (43536)
Preston Law, PLLC
2814 William Neal Pkwy
Fort Collins, CO 80525
(720)425-8289
corey@preston-lawyer.com
*Attorney for Plaintiff*